# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEARL PIERIK and JOHN PIERIK,<br><br>                Plaintiffs,<br><br>    vs.<br><br>GE HEALTHCARE INC.; GENERAL ELECTRIC COMPANY; GE HEALTHCARE AS; BRACCO DIAGNOSTICS, INC.; and MCKESSON CORPORATION,<br><br>                Defendants. | Civil Action No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>1) STRICT LIABILITY: FAILURE TO WARN;<br>2) NEGLIGENCE;<br>3) NEGLIGENT MISREPRESENTATION;<br>4) NEGLIGENCE PER SE;<br>5) BREACH OF EXPRESS WARRANTY;<br>6) BREACH OF IMPLIED WARRANTY;<br>7) FRAUDULENT MISREPRESENTATION AND CONCEALMENT<br>8) CIVIL BATTERY<br>9) LOSS OF CONSORTIUM<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiffs, PEARL PIERIK and JOHN PIERIK, by and through undersigned counsel, and allege as follows:

## INTRODUCTION

1.     Gadolinium is a highly toxic heavy metal and rare earth element.  It does not occur naturally in the human body.  The only known route for gadolinium to enter the human body is by injection of a gadolinium-based contrast agent.

2.     This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the pharmaceutical drugs Omniscan and MultiHance, gadolinium-based contrast agent used in MRIs.

3.     Plaintiffs maintain that Omniscan and MultiHance are defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with their use.

4.     The gadolinium from Omniscan and MultiHance does not wash out of the patient's

body as readily as promised, and instead can be retained indefinitely or permanently in multiple organs and soft tissues (e.g., brain, heart, liver, kidney, bones, and skin) in patients with normal renal function.  This gadolinium, a toxic heavy metal, causes fibrosis in organs, bone, and skin, other adverse reactions, and crosses the blood-brain barrier and deposits in the neuronal nuclei of the brain.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Defendants are all incorporated and have their principal places of business outside of the state in which the Plaintiffs reside.

6.     There is complete diversity of citizenship between Plaintiffs and Defendants. Plaintiffs are residents and citizens of and are domiciled in the State of Illinois.  As set forth more fully below, all Defendants are entities organized in states other than the State of Illinois, have their principal places of business in states other than Illinois, and none of the Defendants is a citizen or resident of the State of Illinois.

7.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.     This Court has general jurisdiction over Defendants GE Healthcare Inc. and General Electric Company, as these Defendants have their headquarters and principal places of business in Boston, Massachusetts, within the District of Massachusetts.

9.     This Court has personal jurisdiction over all Defendants, each of which is licensed to conduct and is systematically and continuously conducting business in this state, including, but not limited to, the marketing, researching, testing, advertising, selling, and distributing of drugs, including Omniscan and MultiHance, to the residents of this state.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the  Defendants conduct business in the District of Massachusetts and are subject to personal jurisdiction in this District.  Defendants sell, advertise, market and/or distribute Omniscan and MultiHance within the District of Massachusetts, and do substantial business in this state and within this District.

11.     Defendants developed, manufactured, promoted, marketed, tested, researched, distributed, warranted, and sold Omniscan and MultiHance in interstate commerce.

## PARTIES

12.     Plaintiff PEARL PIERIK (hereafter referred to as "Plaintiff") is a natural person and at all relevant times a resident and citizen of the State of Illinois.

13.     Plaintiff JOHN PIERIK (hereafter referred to as "Spouse Plaintiff") is a natural person and at all relevant times a resident and citizen of the State of Illinois,

14.     Plaintiff was injected with the linear gadolinium-based contrast agent ("GBCA") Omniscan prior to receiving MRIs on or around August 27, 2013 and August 29, 2013.

15.     Plaintiff was injected with the linear GBCA MultiHance prior to receiving MRIs on or around March 10, 2010, September 4, 2014, September 17, 2014, and August 12, 2016.

16.     Unbeknownst to her and contrary to the Defendant's promotion of GBCAs as benign contrast agents that harmlessly exit the body shortly after administration in patients who did not have chronic/severe kidney disease or acute kidney injury, Ms. Pierik continues to have retained gadolinium in her body many years after being administered the GBCAs, resulting in permanent physical and emotional injuries. She did not realize the connection between her use of linear GBCAs and her injuries until on or around June 2017.

17.     Plaintiff has suffered gadolinium retention in multiple organs and soft tissues (e.g., brain, heart, liver, kidney, bones, and skin).  The gadolinium, a toxic heavy metal, causes fibrosis in organs, bone, and skin, other adverse reactions, and crosses the blood-brain barrier and deposits in the neuronal nuclei of the brain.

18.     At the time of Plaintiff's use of the linear GBCAs at issue, Plaintiff did not have chronic/severe kidney disease or acute kidney injury, and the GBCA manufacturers chose to only provide warnings to patients with these types of reduced renal function. Defendants failed to

appropriately and adequately inform or warn Plaintiff and her healthcare providers about the risks of gadolinium retention in patients with normal renal function.

19.     Defendants General Electric Company and GE Healthcare Inc.  manufacture, test, market, advertise, and sell the linear GBCA named Omniscan.

20.     Defendant General Electric Company is a New York corporation with its principal place of business located in Boston, Massachusetts. Defendant General Electric Company is a resident and citizen of both New York and Massachusetts. Defendant General Electric is the parent company of Defendants GE Healthcare Inc. and GE Healthcare AS.  General Electric Company is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Omniscan into interstate commerce, either directly or indirectly through third parties or related entities.  This Court has personal jurisdiction over General Electric Company under the doctrine of general jurisdiction because this Defendant resides in Massachusetts.

21.     Defendant GE Healthcare Inc. is a subsidiary of General Electric Company. Defendant GE Healthcare Inc. is a Delaware corporation with its headquarters and principal place of business located in Boston, Massachusetts.  GE Healthcare Inc. is a resident and citizen of both Delaware and Massachusetts. Omniscan's package insert/prescribing information identifies the putative distributor of Omniscan as GE Healthcare Inc. GE Healthcare Inc. is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Omniscan into interstate commerce, either directly or indirectly through third parties or related entities.  This Court has personal jurisdiction over GE Healthcare Inc. under the doctrine of general jurisdiction because this Defendant resides in Massachusetts.

22.     Defendant GE Healthcare AS is a subsidiary of General Electric Company. Defendant GE Healthcare AS is a Norwegian corporation domiciled in Oslo, Norway.  Omniscan's

package insert/prescribing information identifies the putative manufacturer of Omniscan as GE Healthcare AS. GE Healthcare AS is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing Omniscan into interstate commerce, either directly or indirectly through third parties or related entities.

23.     Defendant Bracco Diagnostics Inc. manufactures, tests, markets, advertises, and sells the linear GBCA named MultiHance.

24.     Defendant Bracco Diagnostics, Inc. is a Delaware corporation with its principal place of business in New Jersey. Bracco Diagnostics, Inc. is duly authorized to conduct business in the state of Massachusetts and does significant business in the District of Massachusetts. Bracco Diagnostics, Inc. is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over Bracco Diagnostics, Inc. under the doctrine of specific jurisdiction because this Defendant purposefully availed itself of the benefits and protections of this state's laws, and Plaintiff's claim arises out of Defendant's forum-related activities.

25.     Defendant McKesson Corporation ("McKesson") distributes Omniscan, MultiHance, and other gadolinium-based contrast agents in Massachusetts. Plaintiff alleges that McKesson distributed the Omniscan and MultiHance that was injected into Plaintiff.

26.     Defendant McKesson Corporation is a Delaware corporation with its principal place of business in California. McKesson Corporation is duly authorized to conduct business in the state of Massachusetts and does significant business in the District of Massachusetts. McKesson is engaged in the business of storing, distributing, selling, marketing, and/or introducing Omniscan and MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This court has personal jurisdiction over McKesson under

the doctrine of specific jurisdiction because this Defendant purposefully availed itself of the benefits and protections of this state's laws, and Plaintiff's claim arises out of Defendant's forum-related activities.

27.     As used herein, "Defendants" includes Defendants GE Healthcare Inc., General Electric Company, GE Healthcare AS, Bracco Diagnostics, Inc., and McKesson Corporation.

28.     Defendants are authorized to do business in the District of Massachusetts and derive substantial income from doing business in this state.

29.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities within the District of Massachusetts, thus invoking the benefits and protections of its laws.

30.     Upon information and belief, Defendants did act together to design, sell, advertise, manufacture, promote and/or distribute Omniscan and MultiHance, with full knowledge of its dangerous and defective nature.

## FACTS COMMON TO ALL CAUSES OF ACTION

31.     The type of gadolinium retention sustained by Plaintiff occurs in patients without chronic/severe kidney disease or acute kidney injury who develop persistent symptoms that arise hours to months after the administration of a linear GBCA.  Plaintiff had no preexisting disease or subsequently developed disease of an alternate known process to account for the symptoms she sustained.  Gadolinium retention can be a progressive condition for which there is no known cure.

32.     During the years that Defendants manufactured, marketed, distributed, sold, and administered linear GBCAs, there have been numerous case reports, studies, assessments, papers, peer reviewed literature, and other clinical data that have described and/or demonstrated gadolinium retention in connection with the use of linear GBCAs.

33.     Defendants failed to warn Plaintiff and her healthcare providers about the serious health risks associated with linear GBCAs, and failed to disclose the fact that there were safer alternatives (e.g., macrocyclic agents instead of linear agents).

34.     As a direct and proximate result of receiving injections of linear GBCAs

manufactured, distributed, marketed, and/or sold by Defendants, Plaintiff developed gadolinium retention resulting in fibrosis in her organs, skin, and bones, retained gadolinium in her brain, and related injuries.

35.     Had Plaintiff and/or her healthcare providers been warned about the risks associated with linear gadolinium-based contrast agents, she would not have been administered linear GBCAs and would not have been afflicted with gadolinium retention resulting in injuries.

36.     As a direct and proximate result of Plaintiff being administered linear GBCAs, she has suffered severe physical injury and pain, including, but not limited to, gadolinium retention resulting in fibrosis in her organs, skin, and bones, retained gadolinium in her brain, and related injuries.

37.     As a direct and proximate result of being administered linear GBCAs, Plaintiff suffered and continues to suffer significant mental anguish and emotional distress and will continue to suffer significant mental anguish and emotional distress in the future.

38.     As a direct and proximate result of being administered linear GBCAs, Plaintiff has also incurred medical expenses and other economic damages and will continue to incur such expenses in the future.

39.     The nature of Plaintiff's injuries and damages, and their relationship to linear GBCAs, were not discovered, and through reasonable care and due diligence could not have been discovered, by Plaintiff prior to testing for heavy metals in her system in 2017.Plaintiff took urine tests in June 2017 that conclusively demonstrated the continued presence of toxic levels of gadolinium in her body.

40.     Accordingly, the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through reasonable care and diligence should have known, of her claims against Defendants, and in any event such tolling should continue until at least the date of her heavy metal testing results were disclosed in June 2017.

41.     Meanwhile, unknown to Plaintiff, the manufacturers of the linear GBCAs have known since the 1980s that their drugs could cause retention of toxic gadolinium.  But their claims

to the public and healthcare providers about such retention have been misleading and false.

42.     In 1984 – prior to FDA approval – the inventors of linear GBCAs claimed that their product, Gd-DTPA, did not cross the blood-brain barrier, and that the bonds between the toxic gadolinium and its protective coating did not break inside the body.   Additionally, they claimed that there would be no toxic gadolinium residue left behind to cause illness.[1]

43.     There are two basic types of contrast agents differentiated by their chemical structure – linear agents and macrocyclic agents.   The main difference is that the linear agents do not fully surround the gadolinium ion, whereas the macrocyclic agents form a more complete ring around the gadolinium ion which creates a stronger bond.   More specifically, linear GBCAs consist gadolinium linked to a larger open-chained molecule (a ligand). Macrocyclic GBCAs consist of gadolinium linked to a cyclic ligand. The linear GBCAs are chemically less stable in terms of their tendency to release gadolinium ions; the macrocyclic GBCAs tend to stay intact. The linear agents include: Magnevist (manufactured by Bayer), Omniscan (manufactured by GE), OptiMark (manufactured by Guerbet/ Mallinckrodt/ Liebel-Flarsheim), and MultiHance (manufactured by Bracco).

44.     Magnevist, a linear agent, was the first gadolinium-based contrast agent to reach the market after receiving FDA approval in 1988, and in that same year, it was recognized in a paper that gadolinium was breaking free from the bonds in the linear-based contrast agents and this was in part due to the competition for its protective layer (chelate) by other essential metals in the body such as zinc, copper, and iron.[2] Furthermore, emerging science showed that the bond between toxic gadolinium and its chelate or cage (Gd-DTPA) became very weak and separates easily in low pH conditions such as those found in many compartments of the human body including extracellular fluid spaces.

45.     Stability differences among gadolinium contrast agents have long been recognized

---

[1] Brasch RC. Inherent contrast in magnetic resonance imaging and the potential for contrast enhancement – the 1984 Henry Garland lecture. *West J Med.* 1985 Jun; 142:847-853.

[2] Huckle JE, Altun E, Jay M, et al. Gadolinium deposition in humans: when did we learn that gadolinium was deposited in vivo? *Invest. Radiol.* 2016; 51:236-240.

in laboratory (in vitro), and deposition of toxic gadolinium in tissues has been described in animal models since at least 1984. The first major study that showed deposition in humans appeared in 1998 regarding patients with renal failure and later in 2004 in patients with normal renal function.[3]

46.     Laboratory (in vitro) studies assessing the stability of each gadolinium-based contrast agent in human blood were performed and demonstrated that, over time, greater percentages of gadolinium were released from linear agents as compared to the macrocyclic agents.[4]

47.     The lack of stability seen within the linear agents was dismissed as a cause of concern by the Defendants, who claiming that the GBCA's were excreted out of the body according to the drug's claimed half-life, before the chelate could release the toxic gadolinium. However, it was later noted that some conditions could cause prolonged retention of the contrast agents, thus allowing more toxic gadolinium to be released in the bodies of patients. In addition, a delayed elimination phase of the GBCAs would later be discovered.

48.     Peer-reviewed articles on the deposition of gadolinium in animals with normal renal function, some illustrating deleterious consequences, have been published as early as 1984.[5]

49.     Three months after the FDA approval of GE's Omniscan (a linear contrast agent) in 1993, the preclinical safety assessment and pharmacokinetic data were published describing its pharmacokinetics in rats, rabbits, and cynomolgus monkeys. These studies noted that while toxic gadolinium was no longer detectable in the blood 7-days after administration, quantifiable concentrations of gadolinium were persistent in both the renal cortex and areas around bone cartilage.[6]

---

[3] *Id.*

[4] Tweedle MF, Eaton SM, Eckelman WC, et al. Comparative chemical structure and pharmacokinetics of MRI contrast agents. *Invest. Radiol*. 1988; 23 (suppl 1): S236-S239; *see also* Frenzel T, Lengsfeld P, Schimer H, et al. Stability of gadolinium-based magnetic resonance imaging contrast agents in serum at 37 degrees C. *Invest. Radiol*. 2008; 43:817-828.

[5] Weinman HJ, Brasch RC, Press WR, et al. Characteristics of gadolinium-DTPA complex: a potential NMR contrast agent. *AJR Am J Roentgenol*. 1984; 142: 619-624.

[6] Harpur ES, Worah D, Hals PA, et al. Preclinical safety assessment and pharmaco-kinetics of gadodiamide injection, a new magnetic resonance imaging contrast agent. *Invest Radiol*. 1993; 28 (suppl 1): S28-S43.

50.     The first report of toxic gadolinium retention in humans may have been presented in September 1989, a little over 1 year after the approval of Magnevist.   Authors *Tien et al.* reported that intracerebral masses "remained enhanced on MRI images obtained 8 days after injection of gadolinium DTPA dimeglumine (Magnevist)."[7] Subsequent chemical analysis revealed that a high concentration of gadolinium remained in the tissue.

51.     Defendants knew that their linear GBCAs did not have very stable bonds and could come apart easily, causing significant toxicity in humans. Defendants have known about the risks that linear GBCAs pose to people with normal kidney function for years.  In fact, pharmacokinetic studies in 1991 indicated that gadolinium retention was occurring in people with normal renal function.[8]

52.     In 2004, gadolinium was shown to be deposited in the resected femoral heads (bones) of people who had undergone gadolinium MRI studies.[9]  Since then, studies have continued to indicate that gadolinium remains within people's bodies long after the suggested half-life.

53.     Despite this well-documented evidence of gadolinium retention, Defendants have continuously failed to warn consumers and their healthcare providers in the package insert/ prescribing information or in any other way about the risks of gadolinium retention in patients with normal renal function. .

54.     Dermatologists, nephrologists, and other scientists connected the administration of linear GBCAs to a rapidly progressive, debilitating and often fatal condition called gadolinium-induced Nephrogenic Systemic Fibrosis (NSF). This, in turn, prompting the Food and Drug Administration (FDA) to issue a black box warning in 2007 for all GBCAs regarding the release

---

[7] Tien RD, Brasch RC, Jackson DE, et al. Cerebral Erdheim-Chester disease: persistent enhancement with Gd-DTPA on MR images. *Radiology*. 1989; 172:791-792.
[8] Schumann-Giampieri G, Krestin G. Pharmacokinetics of Gd-DTPA in patients with chronic renal failure. *Invest Radiol.,* 1991; 26:975-979.
[9] Gibby WA, Gibby KA, Gibby WA. Comparison of Gd DTPA-BMA (Omniscan) versus Gd HP-DO3 (ProHance) retention in human bone tissue by inductively coupled plasma atomic emission spectroscopy. *Invest Radiol.,* 2004; 39:138-142.

of toxic gadolinium from the linear contrast agents, and its long-term retention in the bodies of animals and humans (for patients with abnormal kidney function).

55.     Accordingly, Defendants revised their labels to include contraindications for use in people with kidney disease and acute kidney injury.

56.     There were over 500 NSF cases reported and it was estimated to be well over a thousand non-reported cases.  Due to the new black box warning in the GBCA's labelling, patients and medical providers were warned about the risks of using GBCAs in patients with chronic/severe kidney disease or acute kidney injury.  However, the warnings for patients with normal kidney function remained unchanged until approximately May  2018. As  a result, for years prior the linear GBCAs continued to be widely used and marketed in patients with normal renal function, notwithstanding the Defendants' knowledge of these risks. Indeed, the vast majority of the medical community was not aware, until recently, of any disease that was associated with gadolinium other than NSF, and even that disease was understood in the medical community to only occur in patients with renal failure. Defendants knew otherwise.

57.     In 2013, while examining non-contrast enhanced MRI images, Japanese researchers found evidence of retained gadolinium in the brains of patients with normal renal function that had previously received one or more injections of GBCAs.  They found that the brain had hyperintense signals in critical areas of the brain.[10]

58.     These findings were confirmed by scientists at the Mayo Clinic in 2014 when autopsy studies were performed on 13 deceased individuals, all of whom had normal or near normal renal function and who had received six or more injections of GBCAs in the years prior. Up to 56 mcg of gadolinium per gram of desecrated tissue were found within the brains of these patients.[11]

---

[10] Kanda T, Ishii K, Kawaguchi H, et al. High signal intensity in the dentate nucleus and globus pallidus on unenhanced T1-weighted MR images: relationship with increasing cumulative dose of a gadolinium-based contrast material. *Radiology*. 2014; 270: 834-841.
[11] McDonald RJ, McDonald JS, Kallmes DF, et al. Intracranial gadolinium deposition after contrast-enhanced MR imaging. *Radiology*. 2015; 275:772-782.

59.     In July of 2015, in response to the Mayo Clinic study's findings, the FDA issued a new public safety alert stating that the FDA was evaluating the risk of brain deposits from repeated use of GBCAs used in MRIs.

60.     In September 2017, the FDA's medical advisory committee voted 13 to 1 in favor of adding a warning on labels that gadolinium can be retained in some organs, including the brain, even in patients with healthy kidneys.

61.     On May 21, 2018, the GBCA manufacturers finally issued a joint warning (i.e. "Dear Health Care Provider" letter) to medical providers about the risks of GBCAs in patients with normal kidney function.  This new "Important Drug Warning" issued by Bayer, GE, Bracco, and Guerbet included the following:

   a.   "Subject: Gadolinium from GBCAs may remain in the body for months to years after injection;"

   b.   A new class warning, patient counseling, and a medication guide;

   c.   Warning that gadolinium is retained for months to years in several organs;

   d.   Warning that the highest concentrations of retained gadolinium are found in bone, followed by organs (brain, skin, kidney, liver, and spleen);

   e.   Warning that the duration of gadolinium retention is longest in bone and varies by organ;

   f.   Warning that linear GBCAs cause more retention than macrocyclic GBCAs;

   g.   Warning about reports of pathological skin changes in patients with normal renal function;

   h.   Warning that adverse events involving multiple organ systems have been reported in patients with normal kidney function;

   i.   Warning that certain patients are at higher risk, including:

        i.   patients with multiple lifetime doses;

        ii.  pregnant patients;

        iii. pediatric patients;

      iv.  patients with inflammatory process;

    j.  Instructions for health care providers to advise patients that:

      i.  Gadolinium is retained for months to years in brain, bone, skin, and other organs in patients with normal renal function;

      ii.  Retention is greater following administration of linear GBCAs than following administration of macrocyclic GBCAs.

62.    This "Dear Health Care Provider" letter is the first time that Defendants made any effort to warn Plaintiff, her health care providers, the medical community, or the general public about the significant risks identified with the use of linear GBCAs.

63.    Therefore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, and nature of their linear GBCAs. Defendants were under a duty to disclose the true character, quality, and nature of their linear GBCAs because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to the Plaintiff, medical providers and/or to their facilities. Defendants are estopped from relying on any statute of limitations because of their intentional concealment of those facts.

## FIRST CAUSE OF ACTION
### (Against All Defendants)
### FAILURE TO WARN -- STRICT LIABILITY

64.    Plaintiff incorporates by reference and realleges each paragraph set forth above.

65.    Zofran was manufactured, sold, marketed, distributed, supplied and/or placed into the stream of commerce by Defendants and was defective at the time it left Defendants' control in that, and not by way of limitation, the drug failed to include adequate warnings, instructions and directions relating to the dangerous risks associated with the use of linear GBCAs.

66.    Defendants failed to provide adequate warnings to healthcare providers and users, including Plaintiff and her healthcare providers, of the increased risk of gadolinium retention and resulting injuries associated with linear GBCAs.

67.     Prescribing physicians, healthcare providers and patients, including Plaintiff and her healthcare providers, neither knew, nor had reason to know at the time of their use of Omniscan and MultiHance, of the existence of the aforementioned defects. Ordinary consumers would not have recognized the potential risks or side effects for which Defendants failed to include appropriate warnings, and which Defendants concealed, including the risk of gadolinium retention in multiple organs and tissues (e.g., brain, heart, liver, kidney, bones, and skin), the resulting fibrosis in organs, bone, and skin, and its tendency to cross the blood-brain barrier and deposit in the neuronal nuclei of the brain.

68.     At all times alleged herein, the Omniscan and MultiHance were prescribed to and used by Plaintiff as intended by Defendants and in a manner reasonably foreseeable to Defendants. The Omniscan and MultiHance injected into Plaintiff's body was neither misused nor materially altered.

69.     Defendants are strictly liable for failure to warn by virtue of its conduct of selling products that are unreasonably dangerous and for failing to provide an adequate warnings about Omniscan and MultiHance.

70.     Defendants are therefore strictly liable by virtue of the following acts and/or omissions:

a)      Failing to adequately and correctly warn the Plaintiff, the public, and the medical and healthcare communities of the dangers of Omniscan and MultiHance with respect to the risk of gadolinium retention;

b)      Failing to disclose their knowledge that gadolinium is retained for months to years in several organs;

c)      Failing to disclose their knowledge that higher concentrations of retained gadolinium are found in bone, followed by organs (brain, skin, kidney, liver, and spleen);

d)      Failing to disclose their knowledge that Omniscan and MultiHance retention is longest in bone and varies by organ;

e)        Failing to disclose their knowledge that linear GBCAs cause more retention than macrocyclic GBCAs;

f)        Failing to disclose their knowledge about adverse event reports involving multiple organ systems in patient with normal renal function;

g)        Failing to disclose their knowledge that certain patients are a higher risk of adverse effects from linear GBCAs;

h)        Failing to disclose their knowledge that Omniscan and MultiHance has a tendency to cross the blood-brain barrier and deposit in the neuronal nuclei of the brain; and

i)        Failing to disclose to patients that Omniscan and MultiHance increased the risk of fibrosis in patients with normal renal function.

71.      Had Plaintiff and her medical providers been adequately warned of the risks associated with Omniscan and MultiHance, Plaintiff would not have used Omniscan or MultiHance.

72.      Had Plaintiff not taken Omniscan and MultiHance, Plaintiff would not have suffered injuries and damages as set forth herein.

73.      As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical and emotional damages, mental anguish, and diminished enjoyment of life, and will require lifelong medical treatment, monitoring and/or medications.

**<u>SECOND CAUSE OF ACTION</u>**
**<u>(Against All Defendants)</u>**
**<u>NEGLIGENCE</u>**

74.      Plaintiff incorporates by reference and realleges each paragraph set forth above.

75.      At all times material hereto, Defendants had a duty to exercise reasonable care to consumers, including Plaintiff herein, in the design, development, manufacture, testing, inspection, packaging, promotion, marketing, distribution, labeling, and/or sale of Omniscan and MultiHance, and post-marketing vigilance regarding same. Defendants knew or should have

known that injecting Omniscan and MultiHance into the bodies of patients created an unreasonable risk of dangerous side effects, including gadolinium retention.

76.     Defendants breached their duty of reasonable care to Plaintiff in that they negligently promoted, marketed, distributed, and/or labeled Omniscan and MultiHance

77.     Plaintiff's injuries and damages alleged herein were and are the direct and proximate result of the carelessness and negligence of Defendants, including, but not limited to, one or more of the following particulars:

a)     In the design, development, research, manufacture, testing, packaging, promotion, marketing, sale, and/or distribution of Omniscan and MultiHance;

b)     In failing to adequately and correctly warn the Plaintiff, the public, and the medical and healthcare communities of the dangerous and defective characteristics of Omniscan and MultiHance;

c)     In the design, development, implementation, administration, supervision, and/or monitoring of clinical trials for Omniscan and MultiHance;

d)     In promoting the subject product in an overly aggressive, deceitful, and fraudulent manner, despite evidence as to Omniscan's and MultiHance's defective and dangerous characteristics due to its propensity to cause irreversible gadolinium retention in multiple organs (brain, heart, liver, kidney, bones, and skin), the resulting fibrosis in organs, bone, and skin;

e)     As to Defendants General Electric Company, GE Healthcare Inc. and GE Healthcare AS, representing in Omniscan's package insert/prescribing information that "Omniscan does not cross the intact blood-brain barrier and, therefore, does not accumulate in normal brain or in lesions that do not have an abnormal blood-brain barrier (e.g., cysts, mature postoperative scars)" when, in fact, such Defendants knew or should have known that

Omniscan can  cross the blood-brain barrier in patients that no not have abnormal blood-brain barrier and deposit in the neuronal nuclei of the brain;

f)      As to Defendants General Electric Company, GE Healthcare Inc. and GE Healthcare AS, representing in Omniscan's package insert/prescribing information that "Gadolinium is eliminated" from the body when such Defendants knew or should have known that gadolinium deposits may be present for months to years in bone, liver, skin, brain, and other organs;

g)      As to Defendant Bracco Diagnostics, Inc., representing in MultiHance's package insert/prescribing information that "MultiHance does not cross the intact blood-brain barrier and, therefore, does not enhance normal brain or lesions that have a normal blood-brain barrier, e.g., cysts, mature postoperative scars" when, in fact, such Defendant knew or should have known that MultiHance can cross the blood-brain barrier in patients that no not have abnormal blood-brain barrier and deposit in the neuronal nuclei of the brain;

h)      As to Defendant Bracco Diagnostics, Inc., representing  in MultiHance's package insert/prescribing information that "Gadobenate ion is eliminated" from the body when such Defendant knew or should have known that gadobenate deposits may be present for months to years in bone, liver, skin, brain, and other organs;

i)      In representing that Omniscan and MultiHance were  safe for their intended use when, in fact, the drugs were unsafe for their intended use;

j)      In failing to perform appropriate pre-market testing of Omniscan and MultiHance;

k)      In failing to perform appropriate post-market surveillance of Omniscan and MultiHance;

l)    In failing to perform appropriate post-marketing testing of Omniscan and MultiHance; and

m)   In failing to disclose that Omniscan and MultiHance increased the risk of fibrosis in patients with normal renal function; and

n)    In failing to disclose adverse event reports with Omniscan and MultiHance involving multiple organ systems in patients with normal renal function.

78.    Because of the adverse effects gadolinium retention can have on patients with normal renal function, Defendants should have promptly disclosed any increase in gadolinium retention risk to patients with normal renal function arising from exposure to GBCAs. Defendants knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendants' failure to exercise reasonable care.

79.    As a direct and proximate result of Defendants' carelessness and negligence, Plaintiff suffered severe and permanent physical and emotional injuries and economic loss, including, but not limited to, gadolinium retention in multiple organs and tissues, which Plaintiff will continue to suffer. Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

80.    Had Plaintiff not been injected with Omniscan and MultiHance, Plaintiff would not have suffered those injuries and damages as described hereon. Had Defendants marketed Omniscan and MultiHance in a truthful and non-misleading manner and/or had Defendants corrected the misrepresentations and adequately warned, Plaintiff would not have been injected with Omniscan or MultiHance.

81.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries and economic loss, and will require lifelong medical treatment, monitoring and/or medications.

82.    WHEREFORE, Plaintiff demands judgment against Defendants in a sum in excess of $75,000, for costs herein incurred, for attorney's fees, and for such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
### (Against All Defendants)
### NEGLIGENCT MISREPRESENTATION

83. Plaintiff incorporates by reference and realleges each paragraph set forth above.

84. Defendants falsely and negligently misrepresented material facts on which Plaintiff and her healthcare providers acted.

85. Defendants also failed to disclose material facts regarding the safety and efficacy of Omniscan and MultiHance with respect to patients with normal renal function.

86. Defendants had a duty to exercise reasonable care to those whom they provided product information about Omniscan and MultiHance and to all those relying on the information provided, including Plaintiff and her healthcare providers.

87. In violation of existing standards and duties of care, Defendants made misrepresentations through their advertisements, labeling, marketing, marketing persons, notices, package insert/prescribing information, and written and oral information provided to patients and medical providers.

88. Defendants negligently represented to patients and the medical and healthcare communities, including Plaintiff and her healthcare providers, that:

    a)     As to Defendants General Electric Company, GE Healthcare Inc. and GE Healthcare AS, "Omniscan does not cross the intact blood-brain barrier" when such Defendants knew or should have known that Omniscan can  cross the intact blood-brain barrier;

    b)     As to Defendant Bracco Diagnostics, Inc., "MultiHance does not cross the intact blood-brain barrier" when such Defendant knew or should have known that MultiHance can cross the intact blood-brain barrier;

    c)     As to Defendants General Electric Company, GE Healthcare Inc. and GE Healthcare AS, "Gadolinium is eliminated" from the body when such Defendants knew or should have known that gadolinium deposits may be present for months to years in bone, liver, skin, brain, and other organs;

    d)    As to Defendant Bracco Diagnostics, Inc., that "Gadobenate ion is eliminated" from the body when such Defendant knew or should have known that gadobenate deposits may be present for months to years in bone, liver, skin, brain, and other organs;

    e)    As to Defendants General Electric Company, GE Healthcare Inc. GE Healthcare AS, and Defendant Bracco Diagnostics, Inc., that Gadolinium was safe and effective for patients with normal renal function;

    f)    As to Defendants General Electric Company, GE Healthcare Inc. GE Healthcare AS, and Defendant Bracco Diagnostics, Inc., Gadolinium had been adequately tested and studied in patients; and

    g)    As to Defendants General Electric Company, GE Healthcare Inc. GE Healthcare AS, and Defendant Bracco Diagnostics, Inc., Gadolinium did not increase the risk fibrosis in patients with normal renal function.

89.    The representations were material, false, misleading, and made with actual or constructive knowledge that they were false.

90.    When Plaintiff used Omniscan and MultiHance, Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

91.    In reasonable reliance upon said representations, Plaintiff's prescribers were induced to prescribe Omniscan and MultiHance and recommend the drug as safe for use in conjunction with MRIs, and Plaintiff was induced to and did use Omniscan and MultiHance when undergoing MRIs. Had Defendants not made the foregoing express and implied false statements about Omniscan and MultiHance, Plaintiff would not have used the GBCAs and her medical providers would not have administered it and recommended it as safe.

92.    Defendants' labeling of Omniscan and MultiHance was also rendered misleading by the omission of the material risk information listed in the preceding count.

93.    Plaintiff and her healthcare providers justifiably relied on Defendants' representations and non-disclosures when using Omniscan and MultiHance.

94.    Defendants knew that Omniscan and MultiHance had not been sufficiently tested for gadolinium retention and that it lacked adequate warnings.

95.    Defendants knew or should have known that use of Omniscan and MultiHance by patients with normal renal function increases the risk of gadolinium retention and resulting injuries.

96.    Defendants knew or should have known that consumers, such as Plaintiff, would foreseeably use Omniscan and MultiHance and that they and their prescribing healthcare providers would rely upon the representations and omissions.

97.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical and emotional damages, mental anguish, and diminished enjoyment of life, and will require lifelong medical treatment, monitoring and/or medications.

### FOURTH CAUSE OF ACTION
#### (Against All Defendants)
### NEGLIGENCE PER SE

98.    Plaintiff incorporates by reference and realleges each paragraph set forth above.

99.    Defendants had a duty to exercise reasonable care and comply with existing standards in the researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, labeling and/or distribution of Omniscan and MultiHance, and post-market vigilance regarding same.

100.    Defendants failed to exercise reasonable care and failed to comply with existing laws in the researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, labeling and/or distribution of Omniscan and MultiHance, and post-market vigilance regarding same.

101.    At all times material hereto, under federal law governing labeling for of Omniscan and MultiHance, Defendants were required to "describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur."

21 C.F.R. § 201.57(e). Breaches of these duties constitute independent acts of negligence under state law.

102.     Prior to 2006, federal law also required Defendants to revise Omniscan's and MultiHance's labeling "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved . . . ." 21 C.F.R. § 201.57(e). Under 21 C.F.R. §314.70(c)(6)(iii), pharmaceutical companies were (and are) free to add or strengthen – without prior approval from the FDA – a contraindication, warning, precaution, or adverse reaction, as soon as there was reasonable evidence of an association of a serious hazard with the drug, *id.* §201.57(e)), and to delete false, misleading, or unsupported indications for use or claims for effectiveness. Breach of this duty is an independent breach of state law.

103.     Defendants failed to exercise reasonable care and violated 21 U.S.C. §§ 331, 352; 42 U.S.C. § 1320a-7b, and 21 C.F.R. §§ 201.57, 201.80, and 201.128, in particular. The violations constitute independent violations of state negligence law.

104.     The laws violated by Defendants were designed to protect Plaintiff and similarly situated persons and protect against the risks and hazards that have actualized in this case. Therefore, Defendants' conduct constitutes negligence per se.

105.     Despite the fact that Defendants knew or should have known that Omniscan and MultiHance significantly increased the risk of gadolinium retention in patients with normal renal function, Defendants continued to negligently market and label Omniscan and MultiHance.

106.     Defendants knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendants' failures to exercise reasonable care, as set forth above.

107.     Defendants' negligence was the proximate cause of Plaintiff's injuries, harm, and economic loss, which Plaintiff will continue to suffer.

108.     Had Plaintiff not taken Omniscan and MultiHance, she would not have suffered injuries and damages.

109. As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical and emotional damages, mental anguish, and diminished enjoyment of life, and will require lifelong medical treatment, monitoring and/or medications.

### FIFTH CAUSE OF ACTION
### (Against All Defendants)
### BREACH OF EXPRESS WARRANTY

110. Plaintiff incorporates by reference and realleges each paragraph set forth above.

111. "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation of promise." G.L.c. 106, § 2-213.

112. "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." G.L.c. 106, § 2-213.

113. Drug manufacturers, such as Defendants, bear responsibility for the content of their label at all times. 21 C.F.R. § 201.80(e). Drug manufacturers are also charged "with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market." *Wyeth v. Levine*, 555 U.S. 555, 570-71 (2009)

114. At the time Plaintiff's medical providers prescribed Omniscan to her, and at the time Plaintiff was infused with the drug, the "Pharmacokinetics" section of the Omniscan label represented that "Gadolinium is eliminated" from the body. Similarly,  at the time Plaintiff's medical providers prescribed MultiHance to her, and at the time Plaintiff was infused with the drug, the "Pharmacokinetics" section of the MultiHance label represented that that "Gadobenate ion is eliminated" from the body. These statements are specific and unequivocal in asserting that gadolinium is eliminated from the body.

115. Onmiscan and MultiHance did not confirm to these express material representations because Defendants knew prior to these representations being made, and prior to Plaintiff's use of Onmiscan and MultiHance, that Omniscan and MultiHance was not completely eliminated from the body, even in patients with normal renal function.

116.    At the time of the making of these express warranties, Defendants knew or should have known that, in fact, these representations and warranties were false, misleading, and untrue in that gadolinium was not safe and fit for its warranted use.

117.    Members of the medical community, including physicians and other healthcare professionals, as well as Plaintiff, relied upon the representations and warranties of Defendants for use of Omniscan and MultiHance in recommending, prescribing, and/or using these drugs.

118.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical and emotional damages, mental anguish, and diminished enjoyment of life, and will require lifelong medical treatment, monitoring and/or medications.

**SIXTH CAUSE OF ACTION**
**(Against All Defendants)**
**BREACH OF IMPLIED WARRANTIES**

119.    Plaintiff incorporates by reference and realleges each paragraph set forth above.

120.    Defendants impliedly warranted to the users of Omniscan and MultiHance and their healthcare providers that Omniscan and MultiHance would be eliminated from the body and were safe and fit for use in patients with normal renal function.

121.    Defendants breached the implied warranties, as Omniscan and MultiHance were not safe and fit for use by patients with normal renal function.

122.    Defendants were aware that consumers, including Plaintiff, would use Omniscan and MultiHance for the purpose intended and warranted by Defendants.

123.    Omniscan and MultiHance reached consumers, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants, and the Omniscan and MultiHance was neither misused nor materially altered.

124.    Plaintiff and her physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Omniscan and MultiHance were of merchantable quality and safe and fit for their intended use.

125.     As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical and emotional damages, mental anguish, and diminished enjoyment of life, and will require lifelong medical treatment, monitoring and/or medications.

**SEVENTH CAUSE OF ACTION**
**(Against All Defendants)**
**FRAUDULENT MISREPRESENTATION AND CONCEALMENT**

126.     Plaintiff incorporates by reference and realleges each paragraph set forth above.

127.     Defendants fraudulently represented to consumers and the medical and healthcare community, including Plaintiff and their providers, that:

a)     Omniscan and MultiHance were safe and effective for patients with normal renal function;

b)     The use of Omniscan and MultiHance in patients with normal renal function did not increase the risk of gadolinium retention;

c)     Omniscan and MultiHance had been adequately tested and studied in patients with normal renal function;

d)     As to. Defendants General Electric Company, GE Healthcare Inc. and GE Healthcare AS, "Gadolinium is eliminated" from the body;

e)     As to Defendant Bracco Diagnostics, Inc., "Gadobenate ion is eliminated" from the body.

f)     As to Defendants General Electric Company, GE Healthcare Inc. and GE Healthcare AS, "Omniscan does not cross the intact blood-brain barrier"; and

g)     As to Defendant Bracco Diagnostics, Inc., "MultiHance does not cross the intact blood-brain barrier".

128.     The representations were material, false, misleading and made with actual or constructive knowledge that they were false.

129.     When these representations were made, Defendants knew the representations were false and misleading.

130.     Defendants made these representations with the intent of defrauding and deceiving healthcare providers and Plaintiff to recommend, prescribe, dispense and/or purchase Onmiscan and MultiHance to treat patients with normal renal function.

131.     When Plaintiff used Onmiscan and MultiHance, she and her healthcare providers were unaware of the falsity of said representations and reasonably believed them to be true.

132.     In reasonable reliance upon said representations, Plaintiff's providers were induced to prescribe Onmiscan and MultiHance to Plaintiff and recommend the drug as safe for use with MRIs, and Plaintiff was induced to and did use Onmiscan and MultiHance prior to her MRIs. Had Defendants not made the false statements about the drug, Plaintiff would not have used the product and her medical providers would not have administered it and recommended it as safe.

133.     Defendants are and were under a continuing duty to monitor and disclose the risks of Omniscan and MultiHance for use with MRIs. They have fraudulently concealed the risks and their knowledge of them. Defendants' fraudulent concealment was designed to prevent, and did prevent, the public and the medical community at large from discovering the risks and dangers associated with Onmiscan and MultiHance use with MRIs. Their fraudulent concealment also prevented Plaintiff from discovering, and/or with reasonable diligence being able to discover her cause of action.

134.     As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical and emotional damages, mental anguish, and diminished enjoyment of life, and will require lifelong medical treatment, monitoring and/or medications.

## EIGHTH CAUSE OF ACTION
### (Against All Defendants)
### CIVIL BATTERY

135.     Plaintiff incorporates by reference and realleges each paragraph set forth above.

136.     In manufacturing and distributing Omniscan and MultiHance for use in MRIs, Defendants intended that gadolinium be injected into patient's bodies, including Plaintiff's.

137.    Defendants intended to cause Plaintiff to be physically touched in an offensive and harmful manner.

138.    Plaintiff was physically touched in an offensive and harmful manner.

139.    Plaintiff did not consent to having Omniscan and MultiHance be retained inside her body for months to years.

140.    As a direct and proximate result of the foregoing acts, Plaintiff suffered physical and emotional damages, mental anguish, and diminished enjoyment of life, and will require lifelong medical treatment, monitoring and/or medications.

## NINTH CAUSE OF ACTION
### (Against All Defendants)
## LOSS OF CONSORTIUM

141.    Plaintiff incorporates by reference and realleges each paragraph set forth above.

142.    At all relevant times hereto, Plaintiff had a Spouse Plaintiff, JOHN PIERIK, who has suffered injuries and losses as a result of the Plaintiff's injuries from Defendants' GBCAs.

143.    For the reasons set forth herein, Spouse Plaintiff has necessarily paid and has become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a  similar nature in the future as a proximate result of Defendants' misconduct.

144.    For the reasons set forth herein, Spouse Plaintiff has suffered and will continue to suffer the loss of his loved one's support, companionship, services, society, love and affection.

145.    For Spouse Plaintiff, Plaintiffs' allege that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

146.    Spouse Plaintiff has suffered great emotional pain and mental anguish.

147.    As a direct and proximate result of the foregoing acts and omissions, Spouse Plaintiff has sustained and will continue to sustain severe emotional pain and mental anguish, economic losses and other damages for which he is entitled to compensatory and equitable damages in an amount to be proven at trial.

## PUNITIVE DAMAGES

148.    At all times material hereto, Defendants knew or should have known that their GBCAs, including Omniscan and MultiHance, were inherently dangerous to patients with normal renal function, including Plaintiff.

149.    At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of their GBCAs, including Onmiscan and MultiHance.

150.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety of the GBCA drug at issue.

151.    At all times material hereto, Defendants knew and recklessly disregarded the fact that their GBCAs could be retained in the body for months to years, resulting in fibrosis in the organs, skin, bones, and brain in patients with normal renal function.

152.    Notwithstanding the foregoing, Defendants continued to aggressively market their GBCAs to consumers, including Plaintiff, without disclosing the aforesaid side effects.

153.    Defendants knew that their GBCAs lacked adequate warnings regarding the risk of gadolinium retention and resulting injuries in patients with normal renal function, but they intentionally concealed and/or recklessly failed to disclose those risks and continued to market, distribute, and sell their GBCAs, including Omniscan and MultiHance, without said warnings so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious and/or negligent disregard of the foreseeable harm caused by their GBCAs.

154.    Defendants' intentional and/or reckless failure to disclose information deprived Plaintiff of necessary information to enable her to weigh the true risks of using GBCAs against their benefits.

155.    Defendants' aforesaid conduct was committed with knowing, conscious, careless, reckless, willful, wanton, and deliberate disregard for the rights and safety of consumers, including

Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

156.     As a direct and proximate result of the foregoing acts, Plaintiff suffered physical and emotional damages, mental anguish, and diminished enjoyment of life, and will require lifelong medical treatment, monitoring and/or medications.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

(a)     For general (non-economic) and special (economic) damages in a sum in excess of the jurisdictional minimum of this Court;

(b)     For medical, incidental, and hospital expenses according to proof;

(c)     For pre-judgment and post-judgment interest as provided by law;

(d)     For full refund of all purchase costs Plaintiff paid for Omniscan and MultiHance;

(e)     For compensatory damages in excess of the jurisdictional minimum of this Court;

(f)     For consequential damages in excess of the jurisdictional minimum of this Court;

(g)     For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(h)     For attorneys' fees, expenses, and costs of this action; and

(i)     For such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

In addition to the above, Plaintiff hereby demands a trial by jury for all causes of action and issues that can be tried by a jury.

Dated: August 13, 2018

**Respectfully Submitted,**
**Plaintiffs Pearl Pierik and John Pierik,**
**By their Counsel,**


By:    /s/ Kimberly A. Dougherty

Kimberly A. Dougherty (BBO# 658014)
**ANDRUS WAGSTAFF, PC**
19 Belmont Street
South Easton, MA 02375
Telephone: (508) 230-2700
Email: kim.dougherty@andruswagstaff.com


R. Jason Richards *(Pro Hac Vice Pending)*
**AYLSTOCK,    WITKIN,    KREIS    &**
**OVERHOLTZ, PLLC**
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Facsimile: (850) 916-7449
Email: jrichards@awkolaw.com


*Attorneys for Plaintiffs*